AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Charles W. Mulaney (312) 469-6042

**FILED**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

AUG 27 2019

**UNDER SEAL**

MAGISTRATE JUDGE MARIA VALDEZ
UNITED STATES DISTRICT COURT

In the Matter of the Search of:

The Google accounts laynie.smatheson@gmail.com
and DWC.Laynie@gmail.com, further described in
Attachment A

Case Number:

**19M572**

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, James J. M. Stephens, a Special Agent of the Department of Health and Human Services, Office of Inspector

General, request a search warrant and state under penalty of perjury that I have reason to believe that on the following

property or premises:

**See Attachment A**

located in the Northern District of California, there is now concealed:

**See Attachment A**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1347 and 1519 | health care fraud and obstruction of justice |

The application is based on these facts:

**See Attached Affidavit,**

Continued on the attached sheet.

_____
*Applicant's Signature*

JAMES J. M. STEPHENS, Special Agent
Department of Health and Human Services,
Office of Inspector General
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 27, 2019

_____
*Judge's signature*

City and State: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                      )
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, James J. M. Stephens, being duly sworn, state as follows:

1.    I am a Special Agent with the Department of Health and Human Services, Office of Inspector General. I have been so employed since approximately May 2016.

2.    As part of my duties as Department of Health and Human Services, Office of Inspector General Special Agent, I investigate criminal violations relating to white collar crime, including health care fraud and obstruction of justice. I have participated in the execution of multiple federal search warrants.

3.    This affidavit is made in support of an application for a warrant to search, pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), for information associated with certain accounts that are stored at the premises owned, maintained, controlled, or operated by Google, a free web-based electronic mail service provider located at 1600 Amphitheatre Parkway, Mountain View, California 94043. The accounts to be searched are laynie.smatheson@gmail.com ("**Subject Account 1**") and DWC.Laynie@gmail.com ("**Subject Account 2**") (collectively, the "**Subject Accounts**"), which are further described in the following paragraphs and in Part II of Attachment A. As set forth below, there is probable cause to believe that in the accounts, described in Part II of

Attachment A, in the possession of Google, there exists evidence and instrumentalities of violations of Title 18, United States Code, Sections 1347 and 1519 (the "**Subject Offenses**").

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of the **Subject Offenses** are located in the **Subject Accounts**.

## I.     BACKGROUND INFORMATION ABOUT GOOGLE

5.     Based on my training and experience and information available from Google's website (google.com), I have learned the following information about Google and Gmail:

a.     Google offers a collection of Internet-based services, including e-mail and online data storage, which is owned and controlled by Google. The services are available at no cost to Internet users, though there are certain options, such as additional online data storage, that users may elect to pay money to receive. Subscribers obtain an account by registering on the Internet with Google and providing Google with basic information, including name, gender, zip code, and other

personal/biographical information. Subscribers are given a Google account which ends in "@gmail.com" which is utilized to access these online services.

b.  Google maintains electronic records pertaining to the individuals and entities who maintain Google online subscriber accounts. These records often include account access information, e-mail transaction information, account application information, and in some circumstances billing and payment information.

c.  Any e-mail that is sent to a Google online account subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Google. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

d.  When a subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google online account users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail may remain on the system indefinitely.

e.  Google online account subscribers can store files, including but not limited to e-mails, documents, and image files, on servers maintained and/or owned by Google. The online data storage service is known as "Google Drive."

3

f.     Google online account subscribers can also utilize a feature known as "History" that allows a user to track various historical account activity, including past Google Internet searches performed, information regarding devices which have been used to login to the Google online account, and physical location information regarding from where the Google online account was accessed.

g.     Google keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

6.     Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Google, such as account access information, transaction information, and account application.

7.     In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Google, to protect the rights of the subjects of the investigation and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A.

4

## II.   FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNTS

### A.   Summary of Investigation

8.    The FBI and HHS-OIG are investigating Summer MATHESON, Terrence EWING, and Richard GRUNDY for health care fraud and obstruction of justice in connection with their work with the Laynie Foundation, Inc.[1] Laynie is a non-profit corporation created by MATHESON and EWING in February 2010 that provided mental health services to children enrolled in the Screening, Assessment, and Support Services ("SASS") program, an Illinois program reimbursed by federal and state Medicaid funds.  Laynie was originally located in Matteson, Illinois, but MATHESON and EWING relocated it to downtown Chicago in 2017. MATHESON was the Chief Operating Officer and managed the company's day-to-day operations. EWING was the Chief Executive Officer and handled the company's billings and finances. GRUNDY began working for Laynie in approximately December 2012 as a

---

[1] MATHESON and Laynie Foundation, Inc. (as well as EWING and GRUNDY) are represented. Because MATHESON is the purported user of both **Subject Accounts 1** and **2**, and to the extent that MATHESON and EWING (who married in November 2015) are also communicating one-on-one via the **Subject Accounts**, a filter agent will be utilized during the search of the **Subject Accounts**, to review these email accounts for responsiveness to Attachment A. If the filter agent identifies any emails as responsive to Attachment A, a protocol will be utilized where those items are segregated from the other seized emails and will only be accessed by filter agents and filter prosecutors until a final determination is made as to whether they are privileged (as either attorney client communications or spousal communications).

therapist and later supervised other therapists and became Director of Personnel and Organizational Development.

9.      Between 2011 and March 2018 (and possibly even later), MATHESON, EWING, and GRUNDY fraudulently obtained millions of dollars from Illinois Medicaid by falsely representing that Laynie provided certain covered mental health services to SASS-enrolled children, knowing that those services were not actually provided as billed, not provided for the length of time claimed, not approved by a licensed practitioner, and/or not covered under Illinois Medicaid. During the course of the scheme, MATHESON used the **Subject Accounts** to conduct business for Laynie, and a related company, D.W.C. Laynie Investments, LLC ("DWC").[2]

10.      This criminal investigation followed a civil investigation that began in 2014 after a former Laynie therapist filed a *qui tam* lawsuit naming Laynie and MATHESON as defendants and alleging that they engaged in fraudulent billing practices to increase payments from Illinois Medicaid. In October 2017, the United States filed a Complaint in Intervention under the False Claims Act against Laynie,

---

[2] According to witness interviews, produced documents, and a subpoena to webhosting provider Homestead, Inc., MATHESON, EWING, and GRUNDY also set up the following company email accounts to conduct Laynie business: smatheson@layniefoundation.org, tewing@layniefoundation.org, and rgrundy@layniefoundation.org.  Laynie's counsel in a pending civil lawsuit brought by the United States against Laynie and others (see next paragraph of this affidavit) notified the AUSA in the civil lawsuit in January 2019 that Laynie used Homstead to host the company's email accounts, including the three email accounts referenced above. A Homestead representative later informed a federal agent that the emails from the Laynie company accounts were not preserved after Homestead terminated Laynie's contract in October 2018.

MATHESON, and EWING (*United States ex rel. Purohit v. Laynie Foundation, Inc., et al.*, 14 C 8511, Dkt. 24 (N.D. Ill.)) based on the fraudulent billing practices and opened a criminal investigation relating to those practices shortly thereafter.

**B.      MATHESON, EWING, and GRUNDY submitted and caused to be submitted false billing to Illinois Medicaid.**

**i.      Background on the SASS Program**

11.      The State of Illinois has adopted statutes, rules and regulations, and guidance governing the provision of mental health services to children in Illinois that are reimbursed by federal and state Medicaid funds. In an effort to provide improved coordination in the delivery of mental health services to children, the state developed the Screening, Assessment, and Support Services ("SASS") program in July 2004 for children experiencing a mental health crisis who are at risk for psychiatric hospitalization. The development of the program created a single, statewide system to: (a) provide screening, assessment, and treatment for a child experiencing a mental health crisis who is at risk for psychiatric hospitalization and whose care will require public funding; (b) enhance access for the child to coordinated community-based mental health services either in lieu of or following inpatient care; and (c) effectively link families and guardians to the appropriate level of care to meet the mental health treatment needs of the child. Thus, one of the program's goals, if possible, is to provide intensive outpatient mental health services to help stabilize a child in crisis while allowing the child to remain at home and in the community.

12.    A child must be enrolled in the SASS program in order to receive SASS services. The entity that qualifies and approves children for SASS services in Illinois is the Crisis and Referral Entry Service ("CARES"), a centralized intake crisis line. CARES performs an assessment of any child referred for crisis services. If CARES determines during the assessment that a child is experiencing (or has recently experienced) a mental health crisis and that the child meets certain age and financial eligibility requirements, CARES will approve a child at risk for psychiatric hospitalization for enrollment in the SASS program. Upon enrollment, CARES also will dispatch a SASS worker to the location of the child in crisis to perform a face-to-face screening to determine if outpatient community services can stabilize the child (as opposed to immediate hospitalization). If it is determined that the child does not require immediate hospitalization, the child is authorized under the SASS program to receive outpatient mental health services for a period of 90 days from a qualified mental health provider.

13.    Following a child's enrollment in the SASS program, the qualified mental health provider the child sees should provide outpatient mental health services to the child in order to prevent a reoccurrence of the crisis and also establish a plan for ongoing community-based services for the child. As the agency responsible for paying claims submitted by providers for services provided under the SASS program, the Illinois Department of Healthcare and Family Services ("HFS") has promulgated administrative rules detailing the specific provider services that are

8

reimbursable under the SASS program. *See* 89 Ill. Adm. Code 140.452-140.456. One of the provider services reimbursable under the SASS program are "[m]ental health services meeting the standards in 59 Ill. Adm. Code 132." *Id.* at 140.454. Part 132 in turn provides information about the mental health services that are appropriate under the SASS program, including what each service entails and who is qualified to perform each service. 59 Ill. Adm. Code 132.

### ii.     Laynie Becomes a Certified Mental Health Provider

14.     Laynie was certified as a Medicaid community mental health services provider in July 2011. The certification allowed Laynie to provide the following mental health services under Part 132: crisis intervention, therapy/counseling, mental health assessment, treatment plan development, mental health case management, and client-centered consultation. Laynie also entered into an agreement with HFS in August 2011 to become an eligible Illinois Medicaid provider that was authorized to submit claims for services rendered to HFS clients, such as children enrolled in the SASS program. Under that provider agreement, Laynie certified in part that it would: (a) comply with all current and future program policy and billing provisions set forth in HFS rules and handbooks; (b) comply with federal and state laws and regulations; (c) be fully liable for the truth, accuracy, and completeness of all claims submitted to HFS for payment; and (d) ensure that the services it provided were in compliance with the applicable laws and HFS handbook provisions since compliance was a condition of payment for all claims submitted to

HFS. EWING signed the agreement on behalf of Laynie, and HFS assigned Laynie a provider identification number.

15.     Laynie began submitting claims to HFS in 2011 for mental health services it provided to children enrolled in the SASS program. The majority of the children Laynie treated were eligible for services under the SASS program. Most of the children resided in the Northern District of Illinois, and many of them were wards of the state. The entirety of Laynie's claims from August 2011 to March 2018 to HFS or a Medicaid managed care organization ("MCO") were for mental health services provided to children enrolled in the SASS program. Laynie electronically submitted its claims during this time. Each claim Laynie submitted included, among other things, one or more billing codes representing each type of mental health service Laynie provided to a patient as well as the time Laynie spent providing each service. HFS and several MCOs in turn paid Laynie a total of over $6 million in federal and state Medicaid funds based on claims received from Laynie from August 2011 to March 2018.

### iii.     Laynie's Fraudulent Billing Practices

16.     Laynie therapists used forms provided by MATHESON, EWING and GRUNDY to keep track of the mental health services they provided. MATHESON and EWING used the information from these forms to generate the claims for payment Laynie submitted to HFS or an MCO.

17.    MATHESON, EWING and/or GRUNDY trained each Laynie therapist on how to complete the forms tracking the mental health services the therapist provided to a child (or child's family) enrolled in the SASS program. Mental health services provided under the SASS program are reimbursed based on the amount of time spent providing the service. 59 Ill. Adm. Code 132.100 (2012). The therapist thus would assign a unit value on the Laynie forms for each mental health service the therapist provided. The unit value the therapist assigned on the forms translated into the amount of time that Laynie billed for each mental health service the therapist provided. For the mental health services provided by Laynie, one unit equated to 15 minutes of time that the therapist spent providing the mental health service.

18.    Because the reimbursement rates for mental health services provided under the SASS program are fixed, MATHESON and EWING increased Laynie's payments from HFS and MCOs by claiming that their therapists provided more mental health services to each SASS patient than were actually rendered. To do this, MATHESON, EWING, and GRUNDY regularly instructed Laynie therapists to inflate the unit values on the forms tracking the mental health services each therapist provided by: (a) recording longer services than were actually rendered; and/or (b) including units for non-reimbursable activities. MATHESON, EWING and GRUNDY also submitted and caused to be submitted claims for services that they knew violated the state's clinical supervision requirements because a licensed practitioner had not certified that the services were medically necessary and met

11

professional standards by reviewing and signing the patient's mental health assessment and treatment plan records.

19.    Multiple former Laynie therapists—specifically, S.C., T.W., K.K., D.W., and J.H.—have testified (either in the grand jury or during civil depositions) that MATHESON, EWING and/or GRUNDY instructed them to use standardized units when providing certain mental health services to patients even if the services did not take that long to provide.  For instance, MATHESON, EWING and GRUNDY instructed the therapists to *always* document 16 units (or 4 hours) when performing a mental health assessment for a child and 8 units (or 2 hours) when preparing a treatment plan for a child.  The former therapists testified that those two services almost always took significantly less time than the standardized units MATHESON, EWING and GRUNDY instructed them to use, yet the therapists used the standardized units based on the instructions they received.

20.    For example, former Laynie therapist S.C. testified that a mental health assessment usually took her about 1.5-3 hours to complete, while a treatment plan took her about 30 minutes to an hour to complete but that she nevertheless documented both services at the standardized units she was instructed to use (16 units and 8 units, respectively). Former therapist D.W. likewise testified that a mental health assessment usually took her about 1-2 hours to complete and a treatment plan took her about 30-45 minutes to complete but that she documented both services as instructed at their standardized units.

21.    Many of the former therapists also testified that MATHESON, EWING, and/or GRUNDY instructed them to artificially inflate the units when providing therapy or other services to or on behalf of their patients. For instance, former therapist S.C. testified that MATHESON instructed her to document at least 2 units (or 30 minutes) when she called a patient and left a voicemail, which S.C. stated took her no more than one minute to complete. Former therapist S.C. also had clinical supervision meetings where she would spend 5-15 minutes discussing each of her patients with a clinical supervisor. Nevertheless, former therapist S.C. testified that she was instructed to document 4 units (or one hour)—the length of the clinical supervision meeting—for each patient that S.C. discussed during the meeting. Former therapist T.W. similarly testified that MATHESON and GRUNDY instructed that she document a 10-minute telephone therapy session with a patient for 3 units (or 45 minutes).

22.    The former therapists also testified that MATHESON, EWING and/or GRUNDY instructed them to include units on the billing forms for activities such as internal case reviews and audits, staff training, clinical supervision, and recordkeeping. Those activities are not reimbursable under Illinois Medicaid. For instance, former therapist T.W. testified that MATHESON required Laynie therapists to conduct "quality assurance and compliance audit reviews" of each other's patient records and that MATHESON and GRUNDY instructed T.W. to

document 12 units (or 3 hours) for the review even though it took T.W. about 30 minutes to complete the review.

23.     The former Laynie therapists further testified that there were weeks and possibly even months when Laynie did not employ a licensed practitioner to review and sign patients' mental health assessments and treatment plans even though Illinois Medicaid (in particular, Part 132) required that both documents be signed by a licensed practitioner. For example, former therapist S.C. testified that MATHESON and GRUNDY told her during training in 2013 that a licensed practitioner needed to review and sign the mental health assessment and treatment plan after S.C. completed both documents for a patient. While Laynie employed a licensed practitioner when S.C. first started, she said that Laynie went weeks to months without one after that licensed practitioner quit yet continued to intake patients and prepare mental health assessments and treatment plans for those patients even though there was no licensed practitioner to sign those documents. Former therapist T.W. similarly confirmed that mental health assessments and treatment plans were not being reviewed and approved by a licensed practitioner during the periods of time when Laynie did not have one on staff.

24.     Some of the billing instructions MATHESON, EWING and GRUNDY provided the therapists were memorialized in writing in Laynie's "Intensive Outpatient Program Manual," which instructed the therapists that certain services

14

that were provided (some of which were non-reimbursable under Illinois Medicaid)

had the following standardized units of care:

- • Mental Health Assessment – 16 units
- • Individual Treatment Plan – 8 units
- • Utilization Review – 12 units
- • Diagnostic Review – 6 units
- • Quality Assurance Audit and Review – 8 units
- • Clinical Staffing – 6 units
- • Clinical Supervision – 4 units.

Multiple former therapists (S.C., K.K., D.W., T.W.) confirmed that they were provided

a copy of the manual and instructed by MATHESON, EWING and/or GRUNDY to

document services in accordance with the manual. In addition, the manual expressly

advised the therapists that Part 132 required that the mental health assessment and

treatment plan be reviewed and signed by a licensed practitioner.

      25.     Many of the former Laynie therapists (S.C., T.W., K.K., D.W.) followed

the instructions MATHESON, EWING, and GRUNDY provided because they were

new to the profession and Laynie was their first experience providing SASS services.

Furthermore, when former therapist S.C. initially did not document mental health

services as instructed, MATHESON and GRUNDY told her that she had to use the

standardized units because Medicaid required it.  When former therapist D.W. did

not document services as instructed, EWING told her during a one-on-one meeting

that she would be fired if she did not document as instructed.  Former therapist K.K.

testified that MATHESON would assign more clients to therapists that documented

units as instructed and reduced the number of clients for the therapists that did not document services as instructed.

### iv. Laynie's Claims Data Reveals a Disproportionate Amount of Billing

26.     From August 2011 to June 2015, Laynie submitted about $7 million in claims for mental health services it purportedly provided to children enrolled in the SASS program, and HFS paid Laynie Foundation about $5.4 million for those claims.

27.     Laynie's billing and payments during that time far exceeded other Illinois SASS providers. For instance, Laynie was the second-highest-paid SASS provider in 2014, receiving over $2.5 million in payments from HFS. However, while Laynie treated 225 SASS patients in 2014, the highest-paid SASS provider in Illinois treated more than 16 times the number of SASS patients (3,683 patients) in 2014 and received only marginally more ($3.2 million) in payments from HFS for the SASS services it provided. Furthermore, while Laynie submitted about 81 claims to HFS for each SASS patient it treated in 2014 and was paid about $11,000 for services it billed for each of those patients, the other top-20 SASS providers in Illinois submitted about 11 claims to HFS for each of their SASS patients in 2014 and were paid about $1,000 for services they billed for each patient.

### v. June 2015 Post-Payment Review of Laynie

28.     The Illinois Department of Children and Family Services ("DCFS") conducted a post-payment review of Laynie in June 2015 to assess its compliance

with Part 132. The review looked at a total of 1,865 units of billing relating to 10 SASS patients. Out of those units, DCFS found that 1,422 units (76%) were *unsubstantiated billings* under Part 132. The 1,422 units equated to $34,071 that DCFS concluded should not have been paid to Laynie. While there were multiple reasons that the 1,422 units were found to be unsubstantiated, three primary reasons the agency deemed these units deficient were: (a) Laynie billed HFS for mental health services that were not recommended on the patient's treatment plan; (b) the service note in the patient record indicated that Laynie billed HFS for a non-reimbursable activity; and (c) there was no corresponding service note in the patient record to support the mental health service Laynie billed to HFS.

29.     DCFS provided its findings from the post-payment review to Laynie later that month in June 2015. Because more than 50% of the reviewed claims were unsubstantiated, DCFS suspended Laynie from further billing until it made certain changes to its billing and documentation practices. Laynie submitted a performance-improvement plan to DCFS in July 2015, and was thereafter allowed to resume billing.

### vi.     Matheson Obstructs the Government's Investigation by Causing Patient Records to be Backdated

30.     A few days after the June 2015 post-payment review, MATHESON hired a licensed practitioner D.R. to review and approve patient notes, such as mental

health assessments and treatment plans, and to provide clinical supervision to the other non-licensed therapists.

31. MATHESON later learned of the United States' civil investigation into Laynie when the United States and the State of Illinois issued a civil investigative demand to Laynie in August 2015 for patient and others records. MATHESON was personally served with that civil investigative demand.

32. At around that same time, MATHESON asked licensed practitioner D.R. to complete a "special project" for MATHESON: to review Laynie patient files from 2013 to 2015, sign them in D.R.'s capacity as a licensed practitioner, and backdate the signature to the date that each service was originally provided to the patient. Licensed practitioner D.R.'s backdated signatures therefore made it appear as though Laynie had complied with the state's clinical supervision requirements to have a licensed practitioner review and sign mental health assessments and treatment plans at the time Laynie rendered those services to its patients, when in fact Laynie had not complied with the state's requirements. Licensed practitioner D.R. testified that she was unaware at the time she backdated the patient records of the June 2015 post-payment review or the government's civil investigation. The "special project" took licensed practitioner D.R. about 50 hours to complete (separate and apart from her other responsibilities at Laynie), and MATHESON paid D.R. about $5000 for the project, with the last installment being paid in February 2016.

33.     Some of the backdated patient records were then produced to the United States in November 2016 in connection with the civil investigation into Laynie's billing practices. Licensed practitioner D.R. reviewed some of the patient files that were produced to the government and confirmed that she had backdated the records.

###     vii.     Matheson Fraudulently Re-Enrolls Laynie in Illinois Medicaid

34.     Following (among other things) the results of the June 2015 post-payment review, the HFS-Office of Inspector General ("HFS-OIG") placed Laynie on a three-year payment suspension in March 2016 based on the credible evidence of fraud.

35.     MATHESON nevertheless applied for an additional Illinois provider identification number for Laynie *one month later* in April 2016, and expressly certified in the application that Laynie had never been suspended from any state or federal healthcare program even though Laynie had just been suspended by HFS-OIG one month earlier in March 2016. The provider enrollment division of HFS approved MATHESON's request for an additional provider number based in part on her false certification.

36.     MATHESON and EWING thereafter submitted claims on behalf of Laynie using the new provider identification number and received about $300,000 in payments that they would not have received had MATHESON properly disclosed the HFS-OIG suspension when she applied for the new provider number.

37. When HFS learned in about March 2019 that Laynie had been submitting claims with the new provider identification number and had received payments for those claims, HFS-OIG sent Laynie a payment suspension letter for the new provider number as well.

### viii. Laynie's Fraudulent Billing Practices Continue Into 2018

38. Notwithstanding the June 2015 post-payment review, the March 2016 payment suspension, and the October 2017 complaint in intervention filed by the United States in the *qui tam* lawsuit, Laynie's fraudulent billing practices continued through at least March 2018.

39. Former intern therapist L.W. worked at Laynie from July 2017 to March 2018 and testified that MATHESON and GRUNDY instructed her to bill for more mental health services than she actually provided. In particular, former intern therapist L.W. testified that while she sometimes discussed a patient for 15-30 minutes during a clinical staff meeting with other Laynie therapists and intern therapists, MATHESON and GRUNDY instructed her to submit a billing form for the *entire* length of the meeting (usually 4-6 units, or 1-1.5 hours) for each patient she discussed, even though the entire meeting was not devoted to any one patient. Former intern therapist L.W. further testified that she resigned from Laynie in March 2018 because: (a) she believed MATHESON and GRUNDY were misdiagnosing patients; and (b) MATHESON admitted to L.W. that MATHESON was putting L.W.'s name on patient records without L.W.'s permission.

### C. Use of the Subject Accounts

#### i. Medicaid Certification (Subject Account 1)

40. On or about April 20, 2011, EWING and MATHESON met with Individual D.R., a DCFS representative, regarding the steps Laynie needed to take to be certified as a community mental health services provider under the Illinois Medicaid program. According to Google, MATHESON created **Subject Account 1**, with a recovery email of ProfessorMATHESON@gmail.com, on or about August 13, 2010.

41. Beginning in April 2011, MATHESON used **Subject Account 1** to communicate with Individual D.R. about Laynie's application to become a Medicaid community mental health services provider. In a series of emails, MATHESON asked Individual D.R. questions about the application process and the required documents.

42. According to Individual D.R., MATHESON at around this time stated that she was interested in having Laynie obtain a subcontract with a DCFS-certified social services provider, so that Laynie could provide mental health services (such as SASS services) to DCFS beneficiaries. DCFS-certified providers that provide covered mental health services to SASS-enrolled children typically bill the Medicaid program through DCFS for those services (since DCFS is the state agency responsible for protecting and caring for Illinois children in need, such as those at risk for psychiatric hospitalization). In that typical situation, DCFS serves as an intermediary between

21

the provider and HFS, the state agency that administers the Illinois Medicaid program.

43.     As previously stated, after being certified as an Illinois Medicaid provider through DCFS in 2011, MATHESON and EWING billed millions of dollars to HFS, which HFS paid to Laynie through the Illinois Medicaid program. According to Individual D.R. and other DCFS representatives, Laynie was the only DCFS-certified provider that was billing mental health services provided to SASS-enrolled children directly to HFS (as opposed to through DCFS). Individual D.R. and others at DCFS thus were unaware between 2011 and 2015 that Laynie was providing mental health services to children enrolled in the SASS program (since Laynie's claims for payment went directly to HFS).

44.     Between 2012 and 2016, MATHESON continued to exchange multiple emails each year with Individual D.R., using **Subject Account 1**. When MATHESON communicated with Individual D.R. over the phone, in person, and over email using **Subject Account 1**, MATHESON asked Individual D.R. questions about DCFS's recertification of Laynie, various policies and procedures, and Medicaid billing rules, among other things. In the course of those communications, MATHESON again indicated to Individual D.R. that Laynie was still seeking a subcontract with a DCFS social service agency in order to provide mental health services to Medicaid recipients. Individual D.R. did not know that Laynie was treating Medicaid recipients and billing HFS directly until about May 2015, when

Individual D.R. learned of the government's civil investigation. Individual D.R. stated that MATHESON never told her over the phone, in person, or over email using **Subject Account 1** that Laynie had decided to provide mental health services to children enrolled in the SASS program without a subcontract with a DCFS social service agency (as MATHESON had represented Laynie would do). As Laynie's assigned Medicaid liaison, Individual D.R. stated that she would have expected MATHESON to tell her that Laynie was providing mental health services to children enrolled in the SASS program without a subcontract with a DCFS social service agency.

45.     On August 26, 2019, a preservation notice was sent to Google for **Subject Account 1**. According to a Google subpoena return dated August 12, 2019, the last login to **Subject Account 1** was on July 15, 2019.

### ii.     Communications with Employee Therapists (Subject Account 1)

46.     According to former Laynie therapist J.H., MATHESON communicated with her using a Gmail account[3] about Laynie-related work while J.H. was employed at Laynie from 2014 to 2017, but J.H. could not recall whether any of the emails with MATHESON related to billing.

---

[3]     J.H. stated the email account she remembered MATHESON using was "smatheson.layniefoundation@gmail.com." When J.H. was asked if she was familiar with **Subject Account 1**, she stated **Subject Account 1** could have belonged to MATHESON.

47.     According to former Laynie intern therapist L.W., she similarly communicated with MATHESON over email about the Laynie patients she was treating, the items she had to complete, how well she was doing her work, and upcoming trainings. Former intern therapist L.W. recalled that MATHESON used both smatheson@layniefoundation.org and **Subject Account 1** to communicate with her.

48.     Former intern therapist L.W. provided me with saved emails she received from MATHESON and GRUNDY in which **Subject Account 1** was the sender, and where **Subject Account 1** was copied on emails from GRUNDY.

### iii.     Communication with CPS (Subject Account 1)

49.     In late 2017 and 2018, Laynie worked with Chicago Public Schools to provide mental health awareness support groups to students, and MATHESON used **Subject Account 1** to correspond with CPS regarding its contract and the services Laynie was providing.

### iv.     DWC Laynie Investments, LLC (Subject Account 2)

50.     MATHESON and EWING created DWC as a limited liability company under Indiana law in 2009. That same year, **Subject Account 2** was created with email address DWC.Laynie@gmail.com and recovery email address of professormatheson@gmail.com. DWC was originally named "MATHESON & MATHESON Realty LLC," but MATHESON changed its name to D.W.C. Laynie Investments, LLC in 2010, the same year that Laynie was formed. According to its

Indiana Secretary of State filings and an "LLC Member Resolution," MATHESON and EWING are DWC's only members and both have served as "President" of the LLC.

51.     Matheson testified during the course of her Chapter 13 bankruptcy proceeding in the United States District Court for the Northern District of Indiana that DWC engaged in real estate investment, curriculum development writing, and medical billing, and paid EWING a salary for "billing services" to Laynie. The government subpoenaed records from DWC and received checks, bank statements, tax and investment documents, and contracts. In those documents, **Subject Account 2** is referenced as the business email address of DWC.

52.     According to subpoenaed bank records and records produced by MATHESON's and EWING's attorney on behalf of DWC, DWC billed Laynie for "Medical Coding and Billing" in 2014, and MATHESON and EWING transferred hundreds of thousands of dollars from Laynie's bank accounts to DWC's bank account. MATHESON and EWING then used the DWC bank account for personal reasons, such as purchasing clothing, paying cable and utility bills, and making campaign contributions.

53.     The "Billing Invoices" from DWC to Laynie state: "Due to the fact that your organization is a not-for-profit, your percentage rate for Billing services are decreased from 8% to 6.5%. For any questions, please contact us at [**Subject Account 2**]. Thank you in advance for doing business with us and we look forward to your

25

continued partnership." As described above, MATHESON and EWING have been married since November 2015 and they controlled both DWC and Laynie before and after they married.

54.     DWC also produced records related to a "Business Credit Extreme Makeover Program" provided by Business Builder Enterprises, Inc., where **Subject Account 2** is used as the contact email address and log-in user name.

### v.     Searching the Subject Accounts

55.     Based on my training and experience investigating criminal violations relating to white collar crime, I believe that a search of email provider account contents often of individuals engaged in criminal conduct yields investigative leads relating to:

    a.     the identities of participants engaged in and witnesses to health care fraud and obstruction of justice offenses;

    b.     the contact information of participants engaged in and witnesses to health care fraud and obstruction of justice offenses;

    c.     the timing of communications among participants and other individuals involved in health care fraud and obstruction of justice offenses;

    d.     the methods and techniques used in health care fraud and obstruction of justice offenses;

    e.     information regarding the physical location of participants engaged in and witnesses to health care fraud and obstruction of justice offenses.

## III.    SEARCH PROCEDURE

56.    In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Google to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.    The search warrant will be presented to Google personnel who will be directed to the information described in Section II of Attachment A; and

b.    In order to minimize any disruption of computer service to innocent third parties, Google employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein.

57.    Google employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant.

58.    Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Google employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

27

## IV. CONCLUSION

59.     Based on the above information, I respectfully submit that there is probable cause to believe that evidence and instrumentalities of violations of Title 18, United States Code, Sections 1347 and 1519 are located within one or more computers and/or servers found at Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043. By this affidavit and application, I request that the Court issue a search warrant directed to Google allowing agents to seize the electronic evidence and other information stored on the Google servers following the search procedure described in Attachment A and the Addendum to Attachment A.

FURTHER AFFIANT SAYETH NOT.

James J. M. Stephens
Special Agent
Department of Health and Human
Services, Office of Inspector General

Subscribed and sworn
before me this 27th day of August, 2019

Honorable MARIA VALDEZ
United States Magistrate Judge

28

## ATTACHMENT A

I. **SEARCH PROCEDURE**

1.     The search warrant will be presented to Google personnel, who will be directed to isolate those accounts and files described in Section II below.

2.     In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.     Google employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant. Google shall disclose responsive data, if any, by sending to 233 N. Michigan Avenue, Suite 1330, Chicago, Illinois 60601 using the US Postal Service or another courier service, notwithstanding 18 U.S.C. § 2252A or similar statute or code.

4.     Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

II.    FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF GOOGLE

To the extent that the information described below in Section III is within the possession, custody, or control of Google, which are stored at premises owned, maintained, controlled, or operated by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043, Google is required to disclose the following information to the government for the following accounts:

**laynie.smatheson@gmail.com and DWC.Laynie@gmail.com**

a.    All available account contents from inception of account to present, including e-mails, attachments thereto, drafts, contact lists, address books, and search history, stored and presently contained in, or maintained pursuant to law enforcement request to preserve.

b.    All electronic files stored online via Google Drive, stored and presently contained in, or on behalf of the accounts described above.

c.    All search history records stored and presently contained in, or on behalf of the accounts described above including, if applicable, web and application activity history (including search terms), device information history, and location history.

d.    All existing printouts from original storage of all the electronic mail described above.

2

      e.    All transactional information of all activity of the electronic mail addresses and/or individual accounts described above, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations.

      f.    All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above, including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing and payment records.

      g.    All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above.

      h.    All account contents previously preserved by Google, in electronic or printed form, including all e-mail, including attachments thereto, and Google Drive stored electronic files for the accounts described above.

      i.    All subscriber records for any Google account associated by cookies, recovery email address, or telephone number to the accounts described above.

      j.    Pursuant to 18 U.S.C. § 2703(d), the service provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

### III.    Information to be Seized by Law Enforcement Personnel

All information described above in Section II that constitutes evidence and instrumentalities concerning violations of Title 18, United States Code, Sections 1347 and 1519, as follows:

1.    Items related to the identity of the user or users of the **Subject Accounts**.

2.    Items related to the physical location of the users of the **Subject Accounts** at or near the times of the **Subject Offenses**.

3.    Items related to the identities and contact information of participants in or witnesses to the **Subject Offenses**.

4.    Financial records, including receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns.

5.    Items related to the following topics or with the following individuals: billing for mental health services; Medicaid rules and regulations; communications with current or former Laynie Foundation therapists and other Laynie interns and employees, including S.C., T.W., K.K., D.W., and J.H.; services provided by D.W.C. Laynie Investments, LLC; the government's investigation of Laynie; communications

with former Laynie therapist D.R. or others relating to D.R.'s backdating of patient records and/or the production of those backdated records to the government; and communications with representatives of HFS or DCFS, including Individual D.R.

6.     All of the non-content records described above in Section II.

## ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the free web-based electronic mail service provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.      searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein.

        b.      surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein.

        c.      opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein, and/or

        d.      performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such

electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.

AO 93 (Rev. 11/13) Search and Seizure Warrant                    AUSA Charles W. Mulaney, (312) 469-6042

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### <u>UNDER SEAL</u>

In the Matter of the Search of:

Case Number:

The Google accounts laynie.smatheson@gmail.com
and DWC.Laynie@gmail.com, further described in
Attachment A

**19M572**

### SEARCH AND SEIZURE WARRANT

To: James J. M. Stephens and any authorized law enforcement officer

  An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

**See Attachment A**

  I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**See Attachment A**

  **YOU ARE HEREBY COMMANDED** to execute this warrant on or before August 29, 2019, in the daytime (6:00 a.m. to 10:00 p.m.).

  Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

  The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>August 27, 2019</u>  2:00 pm

_____
*Judge's signature*

City and State: <u>Chicago, Illinois</u>

<u>MARIA VALDEZ, U.S. Magistrate Judge</u>
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No: | Date and Time Warrant Executed: | Copy of Warrant and Inventory Left With: |

Inventory made in the presence of:

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### I.   SEARCH PROCEDURE

1.     The search warrant will be presented to Google personnel, who will be directed to isolate those accounts and files described in Section II below.

2.     In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.     Google employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant. Google shall disclose responsive data, if any, by sending to 233 N. Michigan Avenue, Suite 1330, Chicago, Illinois 60601 using the US Postal Service or another courier service, notwithstanding 18 U.S.C. § 2252A or similar statute or code.

4.     Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

II.     FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF GOOGLE

To the extent that the information described below in Section III is within the possession, custody, or control of Google, which are stored at premises owned, maintained, controlled, or operated by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043, Google is required to disclose the following information to the government for the following accounts:

**laynie.smatheson@gmail.com and DWC.Laynie@gmail.com**

a.      All available account contents from inception of account to present, including e-mails, attachments thereto, drafts, contact lists, address books, and search history, stored and presently contained in, or maintained pursuant to law enforcement request to preserve.

b.      All electronic files stored online via Google Drive, stored and presently contained in, or on behalf of the accounts described above.

c.      All search history records stored and presently contained in, or on behalf of the accounts described above including, if applicable, web and application activity history (including search terms), device information history, and location history.

d.      All existing printouts from original storage of all the electronic mail described above.

2

e.     All transactional information of all activity of the electronic mail addresses and/or individual accounts described above, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations.

f.     All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above, including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing and payment records.

g.     All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above.

h.     All account contents previously preserved by Google, in electronic or printed form, including all e-mail, including attachments thereto, and Google Drive stored electronic files for the accounts described above.

i.     All subscriber records for any Google account associated by cookies, recovery email address, or telephone number to the accounts described above.

j.     Pursuant to 18 U.S.C. § 2703(d), the service provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

3

### III. Information to be Seized by Law Enforcement Personnel

All information described above in Section II that constitutes evidence and instrumentalities concerning violations of Title 18, United States Code, Sections 1347 and 1519, as follows:

1. Items related to the identity of the user or users of the **Subject Accounts**.

2. Items related to the physical location of the users of the **Subject Accounts** at or near the times of the **Subject Offenses**.

3. Items related to the identities and contact information of participants in or witnesses to the **Subject Offenses**.

4. Financial records, including receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns.

5. Items related to the following topics or with the following individuals: billing for mental health services; Medicaid rules and regulations; communications with current or former Laynie Foundation therapists and other Laynie interns and employees, including S.C., T.W., K.K., D.W., and J.H.; services provided by D.W.C. Laynie Investments, LLC; the government's investigation of Laynie; communications

4

with former Laynie therapist D.R. or others relating to D.R.'s backdating of patient records and/or the production of those backdated records to the government; and communications with representatives of HFS or DCFS, including Individual D.R.

     6.     All of the non-content records described above in Section II.

## ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the free web-based electronic mail service provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein.

b.     surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein.

c.     opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein, and/or

d.     performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such

6

electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.